IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| GILBERT P. HYATT,<br><br>      Plaintiff,<br><br>v.<br><br>COKE MORGAN STEWART, Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office,<br><br>      Defendant. | Civil Action No. 1:25-cv-00415 |

## COMPLAINT

Plaintiff Gilbert P. Hyatt, by and through his attorneys Baker & Hostetler LLP, alleges as follows:

### Nature of the Action

1. This is an action under the Patent Act, 35 U.S.C. § 145, to obtain a patent on patent application serial number 05/849,812 (Dkt. #145). For over four and a half decades, Plaintiff Gilbert P. Hyatt has diligently prosecuted the '812 Application in the U.S. Patent and Trademark Office ("PTO").

2. Congress has provided a cause of action for an aggrieved patent applicant to bring a civil action under 35 U.S.C. § 145 to obtain *de novo* consideration of his entitlement to a patent. Mr. Hyatt brings this action to obtain a patent in this application.

### Parties

3. Plaintiff Gilbert P. Hyatt is an engineer, scientist, and inventor who has obtained more than 70 issued patents. Some of his patents and applications cover microcomputer structure, computer memory architecture, incremental processing,

illumination devices, display devices, graphics systems, image processing, and sound and speech processing. He is 86 years of age and resides in Clark County, Nevada.

4. Defendant Coke Morgan Stewart is the Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office. She has overall responsibility for the administration and operation of the PTO, including the patent examination process. She is named as a defendant in her official capacity only.

## Jurisdiction and Venue

5. This action arises under the patent laws of the United States. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 35 U.S.C. § 145.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) and 35 U.S.C. § 145.

7. This Complaint is timely filed in accordance with 35 U.S.C. § 145 and 37 C.F.R. § 90.3(a)(3)(i).

8. This matter has not been appealed to the United States Court of Appeals for the Federal Circuit.

## The '812 Application

9. Mr. Hyatt is the owner and inventor of U.S. Patent Application Serial No. 05/849,812 (Dkt. #145) (the "'812 Application").

10. The '812 Application has the benefit of the filing date of U.S. Patent Application Serial No. 05/325,941 (Dkt. #114) filed on January 22, 1973.

11. The '812 Application includes the following 98 claims: 58, 87, 111, 116, 136, 147, 148, 153–155, 157, 160, 161, 165–168, 171, 173, 175, 179, 181, 182, 184, 185, 189, 199, 203, 207, 209, 225, 231, 240, 242, 251, 253, 259, 270, 271, 283, 291, 293, 302, 321, 322, 354, 355, 363, 373, 376, 380, 382–384, 391, 416, 420, 424, 434–436, 444, 445, 452, 453, 458, 459, 463, 466, 476–485, 487, 488, 490, 492, 494, 499, 508, 515, 524, 526, 531, 536, 540, 543–546, 554, and 558 (the "Subject Claims").

12. Mr. Hyatt is seeking issuance of a patent on the Subject Claims, but not on any other claims in the '812 Application.

13. The Subject Claims in the '812 Application are generally directed to the following subject matter:

   a. systems or processes of controlling specified equipment with a pulse width signal having a pulse width that represents a magnitude, which pulse width signal is generated based on a bit-serial output signal shifted with an IC output circuit, which is in turn based on a sequence of clock pulses controlled by computer instructions accessed from an IC program memory with an instruction address circuit and based on computer operands accessed from an IC scratch pad memory with an operand address circuit and processed by an instruction execution circuit, but without recitation of RAM memory, specific equipment (i.e., inventory controller, multi-axis tool, photo generator, process controller, three-motor machine, illumination control, or display), or specific machine or computer operations (i.e., direction, path or contour following, starting, stopping, velocity, acceleration, position, cutting, summing, left-shifting, single/double precision, multilevel addressing, or interrupt); or

   b. systems or processes of controlling specified equipment with a pulse width signal having a pulse width that represents a magnitude, which pulse width signal is generated based on input sound information or input data link information, which input information is processed using computer instructions stored in an IC program memory and computer operands stored in an IC scratch pad memory, but without recitation of interrupt.

These lines of demarcation are further evidenced by the specific limitations of each Subject Claim. Each claim of the Subject Claims of the instant application has ascertainable differences in scope from the claims of Mr. Hyatt's co-pending applications.

14. Mr. Hyatt filed the '812 Application on November 9, 1977. As such, this application is governed by the Transitional Rules under the Uruguay Round Agreements Act, Public Law No. 103-465 (1994) ("URAA"), including a provision the PTO implemented in 37 C.F.R. § 1.129(a) ("Rule 129(a)"), that limits to two the number of submissions that an applicant can file, to require limited further examination.

15. The '812 Application is deemed "special" under the PTO rules and must be "advanced out of turn." 37 C.F.R. § 1.102(a). It "continue[s] to be special throughout its entire course of prosecution in the [PTO], including appeal, if any, to the [Board]." MPEP § 708.01.

16. Mr. Hyatt has never made a dilatory filing in prosecuting the '812 Application. In contrast, the PTO suspended prosecution on at least five occasions (11/30/2007, 12/30/2008, 9/24/2009, 4/21/2020, and 3/29/2011), and entered new grounds of rejections at least as late as August 2017.

17. The PTO subjected all of Mr. Hyatt's applications, including the instant application, to the Sensitive Application Warning System ("SAWS"), from at least the late 1990s through 2015. In accordance with the terms of the SAWS, examiners lacked authority to allow Mr. Hyatt's patent applications. Moreover, under the terms of the SAWS, examiners and other PTO officials were directed to consider factors that are irrelevant to the statutory criteria for patentability in determining whether or not to permit Mr. Hyatt's applications to issue as patents. The inclusion of Mr. Hyatt's applications in the SAWS prejudiced the PTO in its consideration of Mr. Hyatt's applications, including the instant application.

18. In May 1978, Mr. Hyatt filed a "Petition to Make Special."

19. In June 1978, the PTO granted the petition, and in July 1978, the PTO entered a restriction requirement.

20. In August 1978, Mr. Hyatt timely responded to the restriction requirement.

21. In September 1978, the PTO sent a non-final office action rejecting all claims.

22. In January 1979, Mr. Hyatt timely responded.

23. In March 1979, the PTO sent a non-final office action rejecting all claims.

24. In August 1979, Mr. Hyatt timely responded.

25. In September 1979, the PTO sent a final office action allowing 11 claims, indicating that another claim would be allowable if put in independent form, and rejecting the rest of the claims.

26. In October 1979, Mr. Hyatt timely responded.

27. In November 1979, the PTO sent an advisory action entering the after-final amendment and indicating that it would make 19 claims allowable but maintaining the rejections of the rest of the claims.

28. In January 1980, Mr. Hyatt timely appealed, and in May 1980, Mr. Hyatt filed his appeal brief.

29. In July 1980, the PTO sent a non-final office action withdrawing the appealed final office action, reopening prosecution, and rejecting all claims, including the claims previously identified as allowable.

30. In December 1980, Mr. Hyatt timely responded.

31. In March 1981, the PTO sent a final office action rejecting all claims.

32. In September 1981, Mr. Hyatt timely appealed, and in December 1981, Mr. Hyatt filed an appeal brief.

33. In March 1982, the PTO sent an examiner's answer.

34. In April 1982, Mr. Hyatt filed a reply brief.

35. In May 1982, the PTO sent another examiner's answer.

36. For nearly two years, the PTO did not take any substantive action. In March 1984, the PTO Board held oral argument, and in April 1984, the Board reversed the examiner rejections as to 20 claims and affirmed at least one rejection of the rest of the claims.

37. In July 1984, the PTO sent a notice of allowance allowing 20 claims.

38. In July 1984, Mr. Hyatt filed a request for reconsideration of the affirmed rejections of some claims, which the Board denied in September 1984.

39. In November 1984, Mr. Hyatt appealed to the Federal Circuit; in February 1985, Mr. Hyatt filed an uncontested motion to withdraw all but nine of the rejected claims from the appeal, and the Federal Circuit granted the motion about a week later.

40. Also in February 1985, Mr. Hyatt filed an appeal brief; in March 1985, the PTO filed an opposition brief; and in April 1985, Mr. Hyatt filed a reply brief.

41. In May 1985, the Federal Circuit heard oral argument, and in June 1985, the Federal Circuit affirmed the rejection of the nine appealed claims.

42. For nearly two years, the PTO did not take any action. In March 1987, the PTO sent an office action allowing 14 claims and indicating that 5 more claims were allowable and would be allowed if placed in independent form.

43. In July 1987, Mr. Hyatt timely responded, canceling the rejected claims and making the requested changes to the allowable claims.

44. In January 1988, instead of granting a patent with the allowed claims, the PTO sent another office action reopening prosecution, indicating one claim was allowed, but rejecting all other claims.

45. In June 1988, Mr. Hyatt timely responded, and in August 1988, Mr. Hyatt filed a supplemental response.

46. In September 1988, the PTO sent a final office action which included a restriction requirement.

47. In March 1989, Mr. Hyatt timely responded with an amendment.

48. In April 1989, the PTO sent an advisory action refusing to consider Mr. Hyatt's arguments and amendment, and Mr. Hyatt filed a petition seeking reconsideration of the non-entry of the amendment.

49. In May 1989, the PTO denied Mr. Hyatt's petition but returned the file to the examiner for consideration of the amendment, and the PTO entered the amendment in June 1989.

50. In August 1989, Mr. Hyatt filed an appeal brief.

51. In March 1990, the PTO filed an examiner's answer, which allowed 12 claims, indicated that 6 claims were allowable and would be allowed if put into independent form, and maintained the rejections of the remaining claims.

52. In July 1990, Mr. Hyatt filed a reply brief, which withdrew the appeal as to three rejected claims but maintained the appeal as to the rest of the rejected claims.

53. In March 1991, the Board affirmed the remaining rejection.

54. In July 1991, Mr. Hyatt filed an amendment making the requested claims to the allowable claims and canceling the restricted or rejected claims.

55. For another year, the PTO did not take any action on the merits. In October 1992, the PTO sent a notice of allowance, and in January 1993, Mr. Hyatt paid the issue fee.

56. In May 1994, the PTO sent a letter indicating that it had lost Mr. Hyatt's file.

57. In June 1994, Mr. Hyatt submitted replacement copies.

58. For more than four and a half years from payment of the issue fee, the PTO did not take any action on the merits. On October 1997, instead of printing a patent with the allowed claims, the PTO notified Mr. Hyatt that it was withdrawing the application from issuance and reopening prosecution, and the PTO sent a non-final office action rejecting all claims.

59. In April 1998, Mr. Hyatt filed responded, and in July 1998, Mr. Hyatt filed a supplemental amendment.

60. For another four years, the PTO did not take any action on the merits. In May 2002, the PTO sent a final office action rejecting all claims.

61. In November 2002, Mr. Hyatt timely appealed and filed a petition to restore his Rule 129(a) rights in light of the PTO having reopened prosecution after the last appeal.

7

62. In January 2003, the PTO dismissed the petition and held the application abandoned.

63. In February 2003, Mr. Hyatt filed a request for reconsideration of the petition dismissal and holding of abandonment.

64. In March 2003, the PTO granted the request for reconsideration.

65. In April 2003, Mr. Hyatt made a submission under Rule 129(a), and in May 2003, Mr. Hyatt filed an amendment.

66. In February 2004, the PTO sent a non-final office action rejecting all claims.

67. In August 2004, Mr. Hyatt timely responded, and in October 2004, Mr. Hyatt filed a supplemental response.

68. In April 2005, the PTO sent a final office action rejecting all claims.

69. In May 2005, Mr. Hyatt filed a request to withdraw the finality of the office action, and in June 2005, the PTO changed the office action to non-final and re-mailed it.

70. In December 2005, Mr. Hyatt timely responded.

71. In April 2006, the PTO sent a final office action rejecting all claims.

72. In October 2006, Mr. Hyatt timely appealed, and in April 2007, Mr. Hyatt timely filed an appeal brief.

73. The PTO did not take any action on the merits for six years after Mr. Hyatt's August 2007 appeal brief. Instead, the PTO suspended examination on five different occasions and did not decide Mr. Hyatt's repeated petitions for action.

74. In April 2013, the PTO reopened prosecution and rejected all claims, and confirmed that the PTO has withdrawn the 1978 restriction requirement.

75. In October 2013, the PTO sent a so-called "Requirement" action that, among other things, reset Mr. Hyatt's time to reply to the April 2013 office action and purported to require Mr. Hyatt to select 600 claims for examination in applications of the "850 Family" (each of which have the same disclosure as the disclosure in the '812 Application) and to identify any earlier embodiment that falls within the scope of any selected claim that Mr.

8

Hyatt believed was entitled to a priority date earlier than November 9, 1977, or to provide a simple statement that the claim was described in the written description of this application, filed on that date, excluding documents incorporated by reference.

76. In late 2013, the PTO sent similar Requirements in nearly all of Mr. Hyatt's applications.

77. In April 2014, Mr. Hyatt timely responded to the office action and the Requirement.

78. In October 2014, the PTO sent a non-final office action rejecting all claims. The PTO acknowledged that Mr. Hyatt's response was "bona fide" and "fully responsive."

79. In April 2015, Mr. Hyatt timely responded.

80. In November 2015, the PTO sent a final office action rejecting all claims. The PTO acknowledged that Mr. Hyatt's response was "bona fide" and "fully responsive."

81. In May 2016, Mr. Hyatt timely appealed, and in October 2016, Mr. Hyatt made a submission under Rule 129(a) removing the finality of the office action.

82. In August 2017, the PTO sent a final office action rejecting all claims, which office action contained a restriction requirement.

83. In January 2018, Mr. Hyatt timely appealed, and in August 2018, Mr. Hyatt filed an appeal brief and a claim-cancellation amendment.

84. In September 2018, the PTO sent an advisory action refusing to enter the claim-cancellation amendment.

85. For nearly four and half years, the PTO did not take any action on the merits. In January 2023, the PTO sent an examiner's answer.

86. The PTO's failure to send an examiner's answer within six months violated the commitment it made to this Court in *Hyatt v. PTO*, No. 14-cv-01300-TSE-TCB, ECF 156 (E.D. Va.).

87. In April 2023, Mr. Hyatt timely filed a reply brief.

9

88. The PTO did not take any action on the merits for another period of nearly two years. On January 3, 2025, the Board sent its decision affirming the rejections of each of the Subject Claims on at least one ground of rejection.

89. *De novo* consideration of Mr. Hyatt's entitlement to a patent on the '812 Application is uniquely necessary due to the PTO's decades-long campaign to prevent Mr. Hyatt from obtaining further patents on his inventions. Beginning in the mid-1990s, when PTO pulled several of Hyatt's applications from issuance, PTO has engaged in concerted action to prevent any of Hyatt's applications from issuing as patents. PTO placed Hyatt's applications into the SAWS program to prevent the mailing of a notice of allowance even where an examiner wished to allow Hyatt's applications. Where Hyatt prevailed before the Patent Board, PTO "recycled" his applications by reopening prosecution after he prevailed before the Board. PTO then began to thwart Patent Board review altogether by placing Hyatt's applications in an administrative purgatory that one federal judge referred to as "never-never land." During this time, PTO misrepresented its intent to act on Mr. Hyatt's applications to at least one federal court. Aspects of that campaign have been attested to in sworn testimony by officials who personally interfered with the examination, issuance, and appeal of Hyatt's applications.

90. Ultimately, after nearly two decades of prosecution, PTO threw out all prior activity and began prosecution anew with the goal of rejecting or forcing Hyatt's applications into abandonment. During this time, the very examiners who were supposed to be impartially examining his applications were creating disrespectful "memes" about him that mirrored the language in the PTO's office actions and were sending emails disparaging his personal character. Meanwhile, PTO management instructed examiners to reject submissions Hyatt had not even made and, within three years of resuming examination, informed a federal court that PTO intended to reject all of Mr. Hyatt's applications. And PTO did, rejecting every claim in every application that the Office had not forced into abandonment, irrespective of the actual merits of the applications.

91. For these reasons, among others, PTO acted in bad faith and prejudiced the proceedings underlying the '812 Application.

### The Written Description Rejections

92. The PTO rejected Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 for alleged lack of written description within the meaning of pre-AIA 35 U.S.C. § 112, first paragraph.

93. The disclosure of the '812 Application describes the claimed subject matter of Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 in such manner that a person of ordinary skill in the relevant field of art would understand that Mr. Hyatt had possession of the invention claimed in that Subject Claim as of the '812 Application's effective filing date.

94. The rejection of Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 under pre-AIA 35 U.S.C. § 112, for alleged lack of written description under pre-AIA 35 U.S.C. § 112, first paragraph, is erroneous.

### The Prosecution Laches Rejection

95. The PTO rejected the Subject Claims and held the '812 Application entirely forfeited under the equitable doctrine of prosecution laches.

96. The rejection for prosecution laches is erroneous.

97. The prosecution laches rejection is erroneous because prosecution laches is not a valid ground of rejection under the Patent Act, particularly for the '812 Application, which is subject to the two-submission limit of the URAA Transitional Rules.

98. The prosecution laches rejection is erroneous because Mr. Hyatt did not delay prosecution.

99. The prosecution laches rejection is erroneous because any delay in the prosecution is attributable to the actions or inaction of the PTO.

100. The prosecution laches rejection is erroneous because any delay in prosecution fairly attributed to Mr. Hyatt is not unreasonable and not unexplained.

101. The prosecution laches rejection is erroneous because Mr. Hyatt's prosecution actions did not constitute an egregious misuse of the statutory patent system.

102. The prosecution laches rejection is erroneous because the PTO failed to warn Mr. Hyatt in advance of any specific actions or inaction of the risk of forfeiture of his rights under the Patent Act in or as to the '812 Application and failed to warn Mr. Hyatt of what specific actions he should take or not take to avoid forfeiture.

103. The prosecution laches rejection is erroneous because the PTO failed to make a sufficient showing of intervening rights.

104. The prosecution laches rejection is erroneous because the PTO unreasonably delayed in asserting prosecution laches after decades of prosecution activity by Mr. Hyatt, prejudicing Mr. Hyatt, who has invested significant amounts of time and money in the prosecution of the '812 Application.

105. The prosecution laches rejection is erroneous because the PTO has unclean hands.

## The Undue Multiplicity Rejections

106. The PTO rejected all of the Subject Claims under pre-AIA 35 U.S.C. § 112, second paragraph, as allegedly failing to distinctly claim the subject matter that Mr. Hyatt regards as the invention under the doctrine of undue multiplicity.

107. Each of the Subject Claims informs with reasonable certainty about the scope of each claim.

108. Each of the Subject Claims distinctly claims the subject matter that Mr. Hyatt regards as the invention.

109. The Subject Claims are distinguished from all claims that Mr. Hyatt seeks to pursue in all of his other applications because each of the Subject Claims are generally directed to the subject matter identified in paragraph 13 above, whereas Mr. Hyatt does not seek to patent any claims that meet the same descriptions in any other of his applications. Each of the Subject Claims contains further specific limitations. Each of the Subject Claims

has ascertainable differences in scope from the claims of Mr. Hyatt's co-pending applications. Each of the Subject Claims of the '812 Application has ascertainable differences in scope from each other.

110. The rejection of the Subject Claims as unduly multiplied under pre-AIA 35 U.S.C. § 112, second paragraph, is erroneous.

### The Obviousness Rejections

111. The PTO rejected certain of the Subject Claims under pre-AIA 35 U.S.C. § 103 as allegedly being obvious over certain references.

112. The PTO rejected Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 as obvious over Chu/Tribken (U.S. Patent No. 2,996,137 and U.S. Patent No. 3,058,697), System IV/70 Manual and Brochure (System IV/70 Brochure (Four-Phase Systems) and System IV/70 Computer Reference Manual (Four-Phase Systems)), Busch (U.S. Patent No. 3,676,846), Buscher (U.S. Patent No. 3,688,099), and Padalino (U.S. Patent No. 3,668,560).

113. Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 would not have been obvious to a person having ordinary skill in the relevant field of art as of the effective filing date of the '812 Application, from the above-identified references or their combinations.

114. The rejections under pre-AIA 35 U.S.C. § 103 are erroneous.

### The Double Patenting Rejections

115. The PTO has rejected Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 for non-statutory obviousness-type double patenting over allegedly conflicting reference claims: U.S. Patent No. 4,829,419, claims 1, 2, 6, 14, 22, 25, 27-32, and 45; U.S. Patent No. 4,686,622, claims 1-4, 6, 7, and 16-25; U.S. Patent No. 4,396,976, claim 9; and U.S. Patent No. 4,120,583, claim 22, combined with teachings of Chu/Tribken, the System IV/70 Manual and Brochure, Busch, Buscher, and Padalino (cited in paragraph 112 above).

116. The non-statutory double-patenting rejections of Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 are erroneous.

### The Provisional Double Patenting Rejections

117. The PTO has provisionally rejected Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 for non-statutory obviousness-type double-patenting over allegedly conflicting reference claims 203, 207-209, 213-215, 220-222, 226-228, 251, 256, 257, 261, 262, 264, 266, 267, 271, and 272 of patent application Serial No. 08/470,856 (Dkt. #859), combined with teachings of Chu/Tribken, the System IV/70 Manual and Brochure, Busch, Buscher, and Padalino (cited in paragraph 112 above).

118. The provisional non-statutory double-patenting rejections of Subject Claims 87, 116, 166, 173, 175, 199, 240, 293, 354, and 376 are erroneous.

119. The provisional non-statutory double-patenting rejections are insufficient to preclude issuance of a patent on the Subject Claims of the '812 Application because the reference claims have not issued.

### Objections

120. Any objections to the specification or drawings are erroneous because the specification and drawings comply with the requirements of law.

### Count I: Issuance of a Patent

121. The above paragraphs are hereby incorporated by reference as if set forth fully herein.

122. Patent Act Section 145 provides a cause of action for a patent applicant dissatisfied with a decision of the Patent Trial and Appeal Board to obtain a judgment that the "applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the Patent Trial and Appeal Board." 35 U.S.C. § 145.

123. Each of the Subject Claims of the '812 Application was involved in the January 3, 2025, decision of the Patent Trial and Appeal Board.

124. Each of the Subject Claims of the '812 Application is patentable.

125. Each of the Subject Claims of the '812 Application satisfies all applicable legal requirements for issuance of a patent.

126. Mr. Hyatt is entitled to receive a patent on the Subject Claims in the '812 Application.

## **Prayer for Relief**

WHEREFORE, Plaintiff respectfully asks that this Court enter Judgment in his favor and that he be granted the following relief:

A. A decree that Mr. Hyatt is entitled to receive a patent for the '812 Application on the Subject Claims;

B. A decree that the rejections of the Subject Claims of the '812 Application are erroneous;

C. A decree authorizing the Director of the United States Patent and Trademark Office to issue a patent for the subject matter claimed in the Subject Claims of the '812 Application;

D. A decree that the specification and drawings of the '812 Application comply with the requirements of law; and

E. Such other and further relief as the Court may deem just and proper.

Dated: March 6, 2025	Respectfully submitted,

/s/ Mark W. DeLaquil
MARK W. DELAQUIL (VA Bar No. 68088)
ANDREW M. GROSSMAN*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1527
agrossman@bakerlaw.com
mdelaquil@bakerlaw.com

*Attorneys for Gilbert P. Hyatt*

* Application for admission *pro hac vice* forthcoming